PRESENT—M'KEAN, CHIEF JUSTICE; SHIPPEN, YEATES AND SMITH,
JUSTICES.

THOMAS MURGATROYD *against* JAMES CRAWFORD.

[S. C. 3 Dall. 491.]

Warranty in a policy of insurance must be strictly complied with.
An agreement for the sale of a ship at a future day, though the payment is anticipated,
does not effect an immediate change of property, against the will and intention of the
contracting parties.

CASE on a policy of insurance on the ship Mount Vernon, George
Dominick master, at and from Philadelphia to Cowes, London, and
one other port in Europe, not in the Baltic or Mediterranean.

The defendant on the 14th May, 1796, underwrote fifteen hundred
dollars on the policy, at a premium of $4\frac{1}{2}$ per cent. whereof 1 per cent.
was to be returned, if the ship should discharge in England. The fol-
lowing warranty was subjoined to the policy: "The assured warrant
the vessel to be an American bottom, and that she carries with her the
documents necessary to prove her such; and it is hereby agreed, that
no condemnation in a foreign court shall operate to prevent the as-
sured's recovery of loss, provided he shall satisfactorily prove the pro-
perty to be such as is warranted, in the city of Philadelphia, and shall,
in other respects comply with the terms of this policy."

On the 2d June following, the Mount Vernon left Philadelphia,
and in two days afterwards passed New Castle. On the 9th June the
pilot quitted her, and in the course of two hours, she was captured
within sight of the light house, three or four leagues from the capes
of Delaware, by the schooner Flying Fish, an armed vessel under the
republic of France, and carried into Porto Rico. While she lay there
she was condemned on the 13th Fructidor (30th August) by the pro-
visional tribunal respecting prizes in Santo Domingo, on five grounds.
1st. That her papers were thrown into the sea in sight of the privateer.
2d. The captain and supercago precipitately left the ship, in spite of
the good treatment of the captors. 3d. The crew of the Mount Ver-
non conducted themselves improperly. 4th. The captain was a Portu-
guese, and not naturalized. 5th. That the United States had in the
last treaty with England, suffered to be added to the articles, which had
theretofore been looked upon as contraband of war, staves, tar, tack-
les, sail-cloth, iron-hoops, all which can be made use of for the vessels.
These were declared to be sufficient motives to condemn the ship.

On the 11th June Captain Dominick protested against the capture,

and was succeeded in a like protest by the first and second mates, and two of the mariners, which last declared, that they had been offered reward to swear to a cause of seizure. On the 14th June, the plaintiff formally abandoned to the underwriters.

It appeared in evidence, that the register of the ship was dated on the 2d May 1796, and that the oath of the plaintiff as owner thereof, had been duly taken and filed.

William Mayne Duncanson, a native of Great Britian who came into New York in August 1794, and had resided in Pennsylvania more than twelve months, and on the 26th April 1796 had taken an oath of allegience to the state of Pennsylvania before the mayor of the city of Philadelphia, had impowered Willings and Francis to purchase the ship insured on his account. They accordingly treated with the plaintiff respecting her, and agreed to his term on the 22d April, becoming personally responsible for the amount. On the 1st June they paid him 5000, dollars in part, and on the 5th June indorsed promissory notes to him dated 22d April preceding, payable in 9, 12 and 15 months for the residue of the consideration money, the whole being 40,000 dollars, which were duly paid after the capture. The vessel has hauled from the wharf of the plaintiff to that of Willings and Francis, and afterwards on the 2d May the plaintiff sent a bill of sale of the ship to Duncanson, to the compting house of Willing and Francis, which continued there about an hour ; but the difficulty occurring as to the impracticability of Duncanson holding a registered ship under the laws of the United States, it was sent back to the plaintiff, and the parties afterwards agreed, that the first contract should be modified, and the vessel be delivered by the plaintiff to Duncanson at a future day ; that a power of attorney should be given to one William Skirron, who went supercargo of the ship, to transfer her to Duncanson on the 1st September, upon her arrival in London, where she was to be subject to the orders of Baring and company, but the stipulated payments to be made at all events to the plaintiff. In consequence hereof, the name of the vessel was changed from the Delaware to Mount Vernon, and she was registered accordingly, at the instance of Duncanson.

Willings and Francis loaded the vessel and charged her with the disbursements, looking to the freight for their indemnification. They swore, that they considered her at the risk of Duncanson, when removed to their wharf ; and that in case of accidents, they should recur to him for re-payment. The plaintiff did not interfere in landing the ship but she was wholly subject to the direction of Willings and Francis. The passage money of one woman was paid to the captain, who ac-

counted therefore with them ; and they received bills on Calcutta from Duncanson for their reimbursement, which had not been paid. The plaintiff fitted the vessel for sea, cleared her at the custom house, and gave the captain his orders. Willings and Francis paid the premiums of insurance to the plaintiff, who paid them over to the insurance broker. The plaintiff himself underwrote 2000 dollars on the vessel, and paid five per cent. commission on the premium to the broker. There was a contrariety of testimony, whether the premium paid to the underwriters was adequate to the risque, and such as was usually received under similar circumstances.

It appeared that Willings and Francis had charged Duncanson in account with 15, 899*l*. 19*s*. 9*d*. the sums paid by them to the plaintiff for the ship. And it did not appear that the particulars of the sale had been communicated to the defendant, previous to his subscription of the policy.

Messrs. Ingersoll, E. Tilghman, and Moylan for the defendant, contended, that the Mount Vernon was neither an American bottom, nor American property. By the act of congress of 31st December 1792, no ships or vessels shall continue to enjoy the benefits and privileges of American bottoms, unless wholly owned and commanded by citizens of the United States. (2 U. S. Laws 131, § 1.) The 4th section directs how the registers of vessels shall be obtained, and prescribes the oath to be taken previous thereto ; in which there is contained a clause, that " no subject or citizen of any foreign prince or state, is directly or indirectly by way of trust, confidence or otherwise interested in such vessel or in the profits or issues thereof ; and in case of a willful false oath, that the vessel with her tackle, &c. shall be forfeited. And the 7th section provides, that if a foreigner or any persons for the use and benefit of such foreigner, shall purchase or otherwise became entitled to the whole, or any part of such registered vessel, the certificate of registry shall be delivered up to be cancelled. By the 24th section it is enacted, that in case of a sale by citizens to other citizens of the United States, the bill of sale shall recite the first register, in order to entitle the vessel to be registered anew. And by the 27th section, the fraudulent using of the register for a ship not entitled to the benefit of the act, shall subject her to forfeiture.

It is of little moment, whether Duncanson had the legal or equitable interest in the Mount Vernon, for in either of the cases, the warranty was not complied with. It is also perfectly immaterial, for what view a warranty is introduced in a policy of insur-

ance, or whether the party had any view at all. Being once inserted, it becomes a binding condition on the insured, and unless he can show that he has literally fulfilled it, or that it was performed, the contract is the same as if it had never existed. Park. 363, (1st edit.) Nor is it at all material, whether the thing warranted to be done be or be not essential to the security of the ship, or whether the loss do or do not happen on account of the breach of the warranty. *Ib.* 364, 392. 1 Term Rep. 346. Cowp. 607.

Duncanson is the real plaintiff. Murgatroyd has received the full consideration for his vessel, and the moneys if recovered, will go to the former. His having taken an oath of allegiance to Pennsylvania, four days after the contract, does not entitle him to the immunities of a citizen by the laws of the union. Nor does Murgatroyd's swearing that the vessel was his property, preclude an inquiry whether she really belonged to him or not. In a contest between him and Duncanson, he could set up no claim after receiving his money for the ship. She might be attached or taken in execution for the debts of the latter, and if burnt or sunk on the 4th May, the loss would have fallen on him. The captain was subjected wholly to his control, through the medium of his agents, Willings and Francis. After the sale, the plaintiff executed no act of ownership, except for the benefit of, and by order of Duncanson. An action may be brought on a policy either by the agent or the party interested. In Great Britain, by stat. 25 Geo. 3, c. 44, it is necessary to insert the name of the person who effects a policy for a principal residing abroad, in the contract, as agent. Park. 18.

No written instrument is necessary to effectuate a sale of personal property. 2 Bl. Com. 447. The delivery of the article, or payment of the whole or part of the consideration, binds the bargain. The sale here, as between the vendor and vendee, was full and complete, by the delivery of the ship and taking notes for the amount, which were to be paid at all events. On the 6th May 1796, Willings and Francis charge Duncanson with the whole amount of the vessel in account.

The essence of insurance is an indemnity. But what indemnity does the plaintiff seek, when he is fully compensated for the ship? If goods are consigned by a merchant beyond sea to a merchant in London, on the latter's account on credit, the property vests in him. And if a trader in the country orders goods from another in the city, and appoints no carrier, and the carrier by whom they are sent embezzles them, the country trader must stand to the loss. His property therefore commences from the delivery to such carrier. 3 Wms. 186. 2 Woodeson. 411.

The British consignees of Duncanson might have ordered the vessel to sail before the 1st September from London, or might even have prevented her coming there from Cowes. Where a deed is delivered to a party himself, and words spoken contrary to the act of delivery, such words are of none effect, *non quad dictum, sed quod factum est, inspicitur.* Co. Lit. 36 *a.* But it may be said, that it was the intention of the contracting parties, the property should continue in the plaintiff until the 1st September. To this we answer, that it would directly impugn the act of the parties. Like a clause introduced into a law, repugnant to its general spirit and scope, the same would be merely void. There cannot be two efficient deliveries of the same chattel. It must pass by the first, otherwise the greatest frauds might be practiced. And there is no certain form of words necessary to effectuate a delivery. Co. Lit.48, *a.* Perk. § 154. 5 Co. 119

The American United States affect in all their public acts the character of a neutral nation, and no neutrals by the law of nations, have a right to cover the property of the citizens or subjects of belligerent powers. If insurance is made in the name of a neutral, for the benefit of a belligerent subject, there can be no recovery on the policy, by reason of the fraud. 1 Emerig. 135. Skin. 327. Park. 196, S. P. The property of the subjects of a belligerent power coming into a country after a war, is liable to seizure, but it is otherwise if they come in before the war. 2 Burlam. 213, § 6. The letter of Sir Leoline Jenkins to the lords commissioners for prizes, dated 17th September 1666, shows that many persons will lend their names and consciences also, to obtain profit, during wars, by cloaked dealings, which are highly censurable. Wesk. Insur. 358, 359. A sea letter declares, that a vessel is solely owned by American citizens. The 20th and 21st articles of the last treaty with Great Britain, dated 19th November 1794, distinguish between citizens and inhabitants. In the case of Wilson v. Marriot, the report of which we have in a late newspaper, the Court of King's Bench determined that a British subject cannot exchange his allegiance, by obtaining a certificate of burghership, so as to be entitled to the benefits of the East India trade. In Talbot's case, the Supreme Court of the United States determined, that he had no right to withdraw himself from America during a war, and cruise on a nation at peace with this country. The purest good faith should be observed in our transactions with foreign nations.

Here has been an undue concealment of a material fact from the underwriters, that Duncanson was interested in the ship. Though the plaintiff affects the ownership at the time of capture, his conduct in subscribing the policy, and paying a commission on the

premium he received, negatives his pretensions. The rate of premium on masqued property will necessarily be higher than on common insurances, and the underwriters would either have demanded a greater sum than 4½ per cent. or have wholly refused their subscriptions. Concealment of an intention to go to a particular port, where the captain could not exercise his judgment in consequence of his orders, vacates a policy. 7 Term Rep. 162. The books abound in cases showing that the insured is bound to disclose all circumstances within his knowledge. 3 Burr. 1419, 1909. 2 Stra. 1183. Park. 194, 195, 196, 199, 200.

Messrs. Lewis, Rawle, W. Tilghman and J. B. M'Kean for the plaintiff, answered: The Mount Vernon was an American bottom when she left the port of Philadelphia, and whether immaterial or not, it is certain she was not condemned on that account. Throwing papers into the sea is no cause of condemnation by the general law of nations, though it may be otherwise by those of France. The remaining reasons assigned in the decree as sufficient motives, are merely frivolous.

The ship did not pass by the contract of 22d April 1796. No delivery then took place, nor was any money paid or notes given. The plaintiff made no such requisition. The bill of sale to Duncanson, it is true, was sent to the compting house of their agents, but was returned in a short period. The parties by mutual consent, rescinded their contract, and made a new one, grounded on the former, with respect to the terms of sale. This clearly may be done, (1 Pow. Contra. 412) and a release may be either tacit or express. Ib. 416. The intention of the parties must always govern in such cases. Ib. 370, 371. And the actions or circumstances attending a transaction may be called in aid, to explain an agreement, otherwise ambiguous. Ib. 385. The generality of words used may be restrained by the particular occasion. Ib. 390. And the bargain of every man ought to be performed as he understood it. 1 Lord Raym. 666.

To assert that the property passed under the first agreement to Duncanson, would contradict the declared intention of the parties, and all their acts. He took an oath of allegiance to Pennsylvania, and was desirous of carrying on a trade to India. Though he could not hold a registered ship until a certain day, when he might claim the rights of citizenship, yet he might make a provisional contract to carry his intentions into execution. When one party performs and the other is trusted, the contract is said to be executory. 1 Pow. Contra, 235. Here Duncanson trusted to the plaintiff, that he would convey the vessel

to him on the 1st September, and in the meanwhile hold her himself without claiming the profits of the voyage. What imperious rule of law can be shown to invalidate such an agreement entered into *bona fide*, and fully understood by both parties ? The sense in which the plaintiff believed he was to transfer the Mount Vernon, fully appears by the oath he took previous to her registry.

The delivery of the ship must be considered as subject to the second agreement, and controlled by it. During the interval, from the 2d May to the 1st September, an execution or attachment might have been laid on the vessel as the property of the plaintiff. Though now the moneys when recovered may be paid over by the plaintiff, yet at the time of capture and condemnation, he had the legal property in the ship. The promissory notes were a collateral security to him, and had not then been paid. Had a default arisen in the payment, he might have refused to vest the property in Duncanson on the 1st September, and have countermanded his letter of attorney. If any possible case could exist wherein the plaintiff might hold the vessel, it is sufficient to entitle the plaintiff to recover. Suppose an alien should make a contract respecting lands, and pay the money under a covenant, that there should be a conveyance made to him on a certain day, when he could obtain the benefit of naturalization, it will not be said that the state could insist on a confiscation.

The latter clauses of the 4th section of the act of congress of 31st December 1792, (so much relied on by the defendant's counsel) have always been constructed to confine the special provisions to the two cases of an owner resident in a foreign country as a consul of the United States, or as an agent for and copartner with citizens of the same states.

No Instance can be cited, within the citizenship of a party forms a subject of inquiry in a prize court, upon a capture at sea. Such an investigation would be attended with insuperable difficulties. The domicil of the former owner can only determine whether his property is liable to seizure, not the place of his nativity. 1 Moll. 54. 1 Inst. Adm. 218. That domicil is defined to be a man's habitation fixed in any place with an intention of always staying there, which may be known either tacitly or by expressly declaring it. 1 Vattel § 218. Duncanson here has unequivocally shown that intention, not only by engaging in the Indian trade here, and obtaining a special act of assembly to hold lands in the government of New York, but by taking an oath of allegiance to the state of Pennsylvania. Nativity does not constitute citizenship. Heineccius 220.

The 23d article of the commercial treaty with France protects the property of the citizens, people and inhabitants of the United States from capture; and the 27th article of the same treaty provides, that if their ships should be met with on the high seas by armed French vessels, they shall only be subjected to search by two or three men. 1 U. S. Laws, 408, Swift's ed. The same provisions are made by the treaty with Spain in the 15th article. *Ib.* 524. So by the 25th and 26th articles of the treaty with the United Netherlands. *Ib.* 452.

It cannot be truly said, that there has been a fraudulent concealment of material circumstances by the insured, which can avoid the policy. Park. 203. On a policy of insurance on a Portuguese ship from Madeira to Jamaica, she was condemned in France on the ground of having an English surpercargo on board. It was insisted, that the agent for the insured ought to have disclosed this fact, on account of a late French ordinance; but the court held the ordinance to be oppressive and arbitrary, and if both parties were ignorant of it, the underwriter must run all risks; and if the defendant knew of the edict, it was his duty to inquire if such a supercargo was on board. *Ib.* 220. Mayne *v.* Walter. Whatever is sufficient to put a party on inquiry, is sufficient notice in equity. 2 Fonbla. 155. A representation is distinguished from a warranty. Park 221, 230. Here has been nothing concealed from the defendant which could tend to make him form a wrong estimate. *Ib.* 199. But why should notice of the particulars between plaintiff and Duncanson have been given to the defendant? Here is an express warranty, that the vessel shall satisfactorily be proved to be an American bottom.

Shippen, J., in the absence of M'Kean, C. J., who was indisposed, gave the following charge in effect to the jury, after stating the evidence fully:

Though none of the five grounds of condemnation inserted in the admiralty decree are legitimate, and though the Mount Vernon was not condemned as British property, yet it is incumbent on the plaintiff to prove his warranty literally, to the entire satisfaction of the jury, before he is entitled to recover.

Of the intentions of Murgatroyd, Duncanson and Willings and Francis, on the 2d May, 1796, when the ship was registered, there can be no doubt: For though a variety of circumstances have been relied on, to show that an immediate vesting of the ship in Duncanson was contemplated, and that seeming acts of ownership have been done by him and his agents, previous to her sailing, yet reliance cannot be placed

on inferences or deductions, where the contract in all its parts is fully shown, and there is express proof of the settled design of the parties, that the property should not be changed until a future day. Whether their intention, under the circumstances of this case, could legally be executed, is the great question ?

It was of considerable moment to Duncanson that the vessel should appear to be an American bottom, in order to trade to the East Indies, which in Great Britain is a monopoly in the East India company. Either a delivery of the chattel contracted for, or payment of the consideration money, will effect a change of property, where such are the parties' intentions ; but where the parties not only contemplate no such change, but expressly guard against it by contract, it would seem strange that the property should pass from the one to the other, contrary to the declared wills of both, though the payments have been by mutual consent anticipated.

Under the act of congress of 31st Dec., 1792, American bottoms must be wholly owned and commanded by American citizens. The register is *prima facie* evidence of property, but not conclusive. On a cursory reading of the 4th section of this act, we apprehended that a positive law of the union invalidated the agreement in the present instance ; but on more full examination and reflection, we now think, that the clause on which dependence is placed, must be restricted to the cases of an owner in the capacity of a consul of the United States, residing in a foreign country, or as an agent and partner in a house composed of citizens of the United States, and actually carrying on trade within the United States. The provisions in this sense seem founded on sound policy, and the necessity of a more minute scrutiny in the enumerated cases, to prevent foreigners from sharing in our ports the same immunities and benefits as our own citizen merchants. We are therefore of opinion, that the contract is not incompatible with that law, and are glad to find that such has been the received construction of the clause.

As a neutral nation, we should undoubtedly discharge, with the utmost good faith all the obligations attendant on our neutral state. And if the jury shall be of opinion, that the present agreement was entered into to lend undue aid to the subject of a belligerent power by masquing his property, it should operate against the plaintiff. But this does not appear to us to be the case.

If any thing material within the insured's knowledge was withheld from the insurer which would have altered the risk and induced the latter to have demanded a higher premium, or prevented him from underwriting, it is also a good objection against the plaintiff's

right of action. Of this the jury will judge as a fact necessary for their decision. It has been remarked with some force, that the silence complained of loses its great effect, when it is considered, that the plaintiff has warranted the ship to be an American bottom, and that he cannot have a verdict, unless he satisfactorily prove her to be such.

Verdict *pro quer.* for 1706 dollars and 67 cents damages.